Good morning, Your Honor. My name is Jonathan Shub. I'm sorry. My name is Jonathan Shub. I represent the appellants, Fox Test Prep and Stephen Price. Before you get started, and I won't – I need to make a few comments. One, as my understanding is, some of this record and the briefs, some of the briefs were filed under seal. Is that correct? Yes. I believe, yes, it was filed under seal. So this is a public – you know, we usually respect what's – it was allowed to be filed under seal. I don't know why. I mean, I don't know why it was allowed to be filed under seal. So as long as we're not violating that seal order here with the exchange we're going to have with you, I would prefer to proceed in a public court. So would I, Your Honor. Okay. So with that sort of foundational point, go for it. Thank you. Well, in other words, I'm not – let me be clear. You don't expect anything to come up in the course of the argument that would refer to any confidential material. I assume it would be over Facebook, right? I don't, Your Honor. But obviously, I can't predict the questions that might come from the court. But I don't expect to have to bring any confidential information up. That's fair enough. Okay. I'd like to reserve, if I could, five minutes for rebuttal. That's all right. Thank you. Your Honors, the district court here abused its discretion by basing its determination of class certification on an improper criteria. Rather than analyzing whether the elements of the breach of contract action in the derivative UCL claim were amenable to proof on a class-wide basis, the Court found that predominance under Rule 23b3 was lacking because the Court concluded that plaintiffs had failed to produce evidence sufficient to convince the Court that Facebook had breached the contract. Now, there's no dispute. Isn't it even more basic than that? Didn't the district court say, hey, it's really hard to find that there was a single uniform contract? Well, it's yes, Your Honor. The district court said, I don't know what the contract is, so I can't tell whether there are common questions or not. That's indeed true, Your Honor. But we have to look at this case in the context of where the procedural history is. We had a motion to dismiss filed by the defendant, Facebook. The Court found that we had a plausible theory for our interpretation of the contract. And the next step in this process is to determine not whether or not we're right about our contract, not whether or not we're going to win or lose, but whether this case should go forward as a class. And here is where the district court went astray. We have one uniform term at issue, the meaning of a click. No question, Your Honors, we in Facebook have a different view of what that means. But what's important is it's identical for each advertiser, whether Joe's Hardware or Petsacola advertises with Facebook. There is one set of rules, one identical algorithms that are used for both advertisers. And we may win or we may lose at summary judgment or a trial. But there's no reason to deny a class here on the basis that we can't prevail. That flies, Your Honors, in the face of Amgen and certainly in a very recent case before this Court, the Stockton v. City of San Francisco case, where the Court was faced with the same errors made by district court. There, there was an age discrimination claim. The plaintiffs had said that there were certain studies that they had that would establish their case. They had a statistical balance, or I'm sorry, a statistical study that would prove their case. They didn't need to do that because it was not a merits determination. But the Court said, well, you know, I don't buy your inference of discrimination, and therefore I'm going to dismiss the case on that ground. Came up to this Court, and the Court said, that's not what Amgen and what Dukes and what Comcast teaches us. It teaches us that the merits are critical. They certainly are in this era of class certification. And a rigorous analysis is equally as critical. But how the merits play, Your Honors, is not whether we're going to win or lose, but can the case be adjudicated on a class-wide basis. Well, Your Honor, I disagree. Well, show me where she said that. I will. At ER 14 in the record, page 14. ER 14? Yes. Okay. She said, and let's take a look at it. She said there, and I'll allow you, obviously, to get to it. I got it. She says there. What line? Let me pull that out. At lines 10 to 14, she says the Court finds that the proposed class cannot be certified under Rule 23b-3. Page 14, line what? I'm sorry, line 10 to 14. 10 to 14? Yes. Well, go ahead and read it. The Court finds that the proposed class cannot be certified under Rule 23b-3 because common questions do not predominate with regard to plaintiffs' claim of systematic breach of contract. In particular, plaintiffs had failed to establish that the terms of the contract that were allegedly breached by Facebook are part of any contract between advertisers and Facebook. That's a merits determination. That's a determination that should be made, if at all, by the Court. Well, that's not the same as saying, you know, there's no merit to your claim. She didn't reach the merits. In other words, she's trying to find, you know, one, whether there are common questions, and two, whether those questions predominate. And the first thing, I mean, you've got to, in this case, don't you think, you've got to go through analysis. Is there a contract? Because you're alleging a breach of contract, right? That's correct. So she's got to say, is there a contract? What are the terms of the contract? And are they amenable of, you know, of a common determination? That's all she's doing. Your Honor, that determination was made in the first instance at the motion dismissed. The district court heard the same argument that Facebook made, and that is we couldn't establish the contract. The Court said, no, you have established an ambiguity as to what the meaning of the term CLIC is in this contract. We will proceed. Well, she basically said you have a plausible theory that you should be allowed to go forward into litigation. Actually, Your Honor, it was a difference of judge. It was Judge Fogel, and then it got turned over to Judge Hamilton after Judge Fogel. But all the motion to dismiss determines is whether or not you have a, you know, plausible claim that's worthy of going forward. That is correct. I mean, I think most any district judge would probably let this go forward at the motion to dismiss stage. That's correct. But the analysis that she, that the Court undertook at the class certification stage was a predictable, was predicting whether or not we would win, whether or not we would establish that Facebook exercised unreasonable discretion in determining what a CLIC is. And the analysis at this point, then, is to ask, will that proof live or die together in one for all? If she, if the Court is right that there's no contract, then we should lose its summary judgment. If the Court is wrong, we won't lose. But the issue here is that it is a uniform determination. If 5,000 trials were conducted, Your Honors, and Facebook were sued by advertisers 5,000 times, they would offer the same defense, we would offer the same proof as to why they exercised unreasonable discretion. They would say, no, we didn't, we honored the contract. The point is that there would be no variation in the proofs. There is no variation here because the uniform material term, what is a CLIC, is the same for every advertiser. As I understand it, she said two things. Number one, that you failed to show a uniform contract, which is different from saying that you failed to buy a, appoint a contract. And number two, that you cannot differentiate between a person that has a contract and there's, and then Facebook takes itself out of fraudulent CLICs. You can't determine a fraudulent CLIC from a, an honest, let's put it that way. Your Honor, she's the District Court said that, but without any analysis. All it said is there's, quote, unquote, no way you could do that. That's not quite, she did have the declaration from your expert. She considered it, and then she said, you know, based on that, you can't prove. Your Honor, the declaration from our expert, all that did was, was demonstrate exactly what Facebook does every day, and that is make determinations between valid and invalid CLICs. Dr. Jacobson is a Ph.D. from University of San Diego, of University of California at San Diego. He is a security expert for PayPal. His job is to deter and detect fraud. He testified in a very extensive declaration, which was accepted under Daubert because no one challenged it, that he could, in fact, devise algorithms that would predict the intent of a fraudulent invalid CLIC versus an invalid CLIC. That is a plausible methodology because it's what Facebook does every day. Secondly — Well, but he didn't say he did it. He said, I could do it if somebody asked me. Something like that, right? That's correct, Your Honor. But it's never been done. Well, it is, it is done in one sense. It's done by Facebook — Well, it's never been done in this record. He says, you know, I could do that if somebody asked me to do it. That's all he said. He didn't say, you know, in fact, yes, I've done that. That's all that's required at the class certification stage, because if it wasn't, we would get into what Costco called a mini-trial on the merits. We are not obligated. All he has to do is put in his declaration, yes, I've done it. This is the way, this is my formula. That's all. He said, I have — You would accept that for purposes of the certification area, that plaintiffs can induce that rule. He said in his declaration, Your Honor, that I have looked at the algorithms that Facebook uses. I am able to modify them. I — we are able to determine whether or not a click would be invalid and not billable or fraudulent and, therefore, out of the case. Facebook's expert didn't contest that that can't be done. They just said that you needed the data that were in the hands of the advertisers to make the determination. But we know that doesn't conclude with reality, because Facebook doesn't use data that's in the hands of advertisers, but it makes its decisions every day. This is a — this is a robotic, mechanical exercise. The issue before us is, is there rules, the mechanical rules they use, which are the same for everybody, are they reasonable? That's a one-for-all, all-for-one under Amchem and under the city of Stockton case that would resolve for everybody. There's no distinctions. Let me take it to the next step. You say he can determine whether a click is fraudulent or not. In other words, can he distinguish, that's a fraudulent click, that's an honest click, fraudulent, honest, and that would identify, then, for class members, perhaps, if he could say, you know, Gordon Quist made an honest click here. How are you going to identify your class? Can he identify the particular people who would be frauding Facebook and the advertisers? No, he — I thought his algorithm showed there'd be so many honest clicks and so many dishonest clicks. There would be — well, yes, Your Honor, there would be valid clicks. But that's different. The problem within the class is you don't know who the honest people are and the dishonest people are. Isn't that a problem? It's not, Your Honor, because Dr. Jacobson said he was able — he would be able to write algorithms that would make the distinction between an invalid click that was — should not have been billable to the advertiser versus a fraudulent click which Facebook has disclaimed any liability for. We understand that fraudulent clicks are not part of this case. Dr. Jacobson understood that. He said in his deposition, he said in his reports, yes, I understand that I have to accept those types of clicks. That is something that he said he could do. There's no — there's no analysis by the district court as to why he couldn't do it other than, you know, basically one line that said there's no way he could do it. I accept the analysis of Facebook's expert. We don't know why. There's no reasoning to determine what was it about Facebook's expert that was persuasive and not persuasive about Dr. Jacobson's report. Let me go back to the beginning of it. The class that I've written down here, correct me if I'm wrong, okay, I might be wrong. All persons and entities in the U.S. who paid dollars to Facebook for cost-per-click advertising from 5 — May 2009 to the present, is that your class? Yes, it is. That would include — okay. I see my time is running. I'd like to reserve a couple minutes. Yes, that's fine. That's fine. We'll give you time for that. Thank you. Of course, if there's more questions here, I'm happy to — No, no. Let's hear from — let's hear from Facebook. May it please the Court, Kristen Miles with Margaret Talzin Olson for Facebook. Plaintiffs are seeking to overturn the district court's order on multiple grounds. The district court found on multiple grounds — excuse me, that class certification was inappropriate. Each of those grounds would be independently sufficient to uphold the district court's order. So each of those would have to be shown to have been an abuse of discretion. Let me go right into the issue of predominance because that's what's been the subject of most of the discussion here. There's two aspects to the court's ruling on predominance. One is whether there was a uniform contract encompassing the terms that plaintiffs say were violated here. Why isn't that issue class-wide? Well, the issue is there's no question that there's a class-wide contract. And plaintiffs cite a lot of cases that say a class-wide contract is a good candidate for class certification. It's somewhat of a simplistic statement supported by a lot of cases. The problem here is that the class-wide contract doesn't contain the term that plaintiffs are saying was breached. So they say — well, there's multiple levels to what plaintiffs say the contract was, each one of which is problematic, both under California contract law and as a matter of predominance. First, they say — what the contract actually says is pay per click. That's the field that's in the record where you click on a dot that says pay per click as opposed to paying per 1,000 impressions. Then that takes you to — then that you have — by signing up, you sign on to the Statement of Rights and Responsibilities. That says we will charge you according to our tracking mechanisms. That's what the contract says. The Statement of Rights and Responsibilities also has in it an integration clause. The integration clause does not incorporate, nor do the other terms of the contract incorporate, the help center, the glossary terms, and these other things. Glossary terms is like thousands of entries on the company's website that get changed constantly and are not fixed at any time. So you have the contract, click, and the term that says we will be invoicing you according to our tracking mechanisms. Well, plaintiffs want to say — Why is it kind of a uniform contract? Well, that is a uniform contract. The problem is it doesn't — it doesn't — in the words — if you look to Walmart, Walmart's a good kind of analogy to why we say that's not sufficient. Just because it's a form contract, you still have to ask questions that lead to a class-wide answer that would result in a breach of that contract. Just like in Walmart, the court said you can't just ask, does the company have a policy? You can't just ask, does the company have, you know, a delegate to its manager's discretion to make promotions and other things, other employment decisions? That's a class-wide question, perhaps, but it doesn't get to why was I disfavored? Why was I harmed? That's the question that the court in Walmart said. So what they say here, though, along that line, is they say, well, the click — the term click in this contract is ambiguous. Right. And it only really means legitimate click. Right. They say click, so that gets you to the second step of what they need to incorporate to get them home to that kind of Walmart-related question. What's the class-wide breach, the class-wide injury? Which is what Walmart says you have to have, the same injury for everybody. Legitimate appears in the glossary terms. That's where it says if you click on the glossary, you have to go outside the contract. You can't get there through the contract. You go into the help center, you type in click, and it says Facebook endeavors to bill only for legitimate clicks. So then what does legitimate mean? Plaintiffs originally said that was the contract. Now they don't really argue that anymore. They say that's extrinsic evidence bearing upon the meaning of the word click. The district court rejected both theories. The court said it's not part of the contract because it's not incorporated. There's an integration clause. It's not there. But if you look at it as extrinsic evidence, it's still problematic, because as plaintiffs themselves concede, it's itself ambiguous. What does legitimate mean? And then you have, as well, the term of the contract that says our tracking mechanisms. So you're going to be terming legitimate according to Facebook's tracking mechanisms. So plaintiffs don't allege that Facebook breached its own tracking mechanisms. So they have to go to the next step, which is, well, legitimate must mean something external. Therefore, let's look to industry standards. And that's where they get the IAB, which comes in and says companies should have filters to determine what clicks are legitimate. Companies should have we recommend that companies have external audits, and we recommend that companies publish descriptions of methodology. Plaintiffs want to bring all that into the contract and say all of that is part of the word legitimate, which is, in turn, a qualification on the word click. And all of that is problematic at several levels, both under California law. You can't add to new terms to a contract under the guise of industry standard or even under the guise of extrinsic evidence or under the guise of good faith and fair dealing, which plaintiffs also argue. But you – and the other problem is, with respect to – But you can use it. You can use it under California law to help a plaintiff term the contract. Right. I was just going to get to that, Judge Tashima. The other problem is that California law is very clear that unless the extrinsic evidence is evidence that both parties viewed or relied upon, it can't be part of the party's contract. That's what Judge Fogle held at the motion-to-dismiss stage. There were two motions to dismiss – two motion-to-dismiss rulings, and the first one he said to the plaintiffs, you can't allege that you – you haven't alleged that you saw or relied on this extrinsic evidence, this help center evidence. He said, you have to allege that in order to state a cause of action under California law. Because absent reliant – Do you think their ruling is correct? Yes, I do. There's a – we've cited several cases in our brief, Your Honor. How does that fit with the objective theory of contract? Well, that's an excellent question. And plaintiffs briefed that. We briefed it in our brief as well. Probably the best explanation of why those two things are not talking about the same thing is the Eighth Circuit's decision in Averitt, which we cited. We recommend reading that because it really explains it well. But I'll try to do the best I can. It is – the objective theory of contract says that you read the words of the contract as they would be understood by a reasonable person or a reasonable person in the industry, depending on what test you're applying. That's the objective theory to which California adheres. That is entirely different from – But then doesn't extrinsic evidence get incorporated into that theory in the same way? No, Your Honor, because the extrinsic evidence is departing from or adding to the terms of the contract, and if it's – Oh, it's explaining the contract. If it's explaining it, it still needs to be – it needs to have been known to both parties. And we cited the Smith case at pages 28 to 29 of our brief. Judge Fogel at ER 618 reached the same conclusion about California law. We also cited the Lozano case in which this Court reached the same conclusion. And there's another case called Gregorick in which Judge King analyzed this same issue, which we've cited in our brief as well. At page star 7, Judge King cites Lozano and discusses some other cases as well. The basic point is that extrinsic evidence can be used to interpret an ambiguous contract, but if the parties had no awareness of it, for example, a help center snippet, a frequently asked question snippet, that can't be imposed upon the parties under the guise of extrinsic evidence. So if you – so Judge Fogel told the plaintiffs that, and they went ahead and alleged that they had in fact seen these materials, these help center materials, and relied upon them. Now, we believe that ruling is correct, but certainly it is correct that if that's – that that would have to be evaluated on a class-wide basis. If you're going to add new terms to the contract, which we think this is – now, I understand you can – plaintiffs argue that it's just interpreting the term click, but they're importing so much into it. They're importing multiple click filters that they haven't really even defined, but they say must be out there to determine what's valid and what's invalid. They want to import filters compressing the time – I mean, increasing the time between clicks that would cause the click to be valid. In other words, clicks that were less than 30 minutes apart, clicks that are – would be invalid versus what Facebook has in place, which is a 30-second rule. Again, they don't point to any industry standard that imposes any timeframe. The IAB disclaims any timeframe. All of plaintiffs' experts say they don't know that there's a timeframe. But they want to tell – they want to tell us that that also must be part of click, the word click, even though they don't tell us even now what the proper interval should be. But – so we don't think that – we do think they're adding terms, and they're adding the audit requirement, which is not in the contract, and it's not a reasonable interpretation of the word click. And they're trying to add this description of methodology requirement. Bottom line is, though, even if it's interpreting an ambiguous term in the contract under California law, it needs to be known to the parties. It's just a – it's a flaw in their case because they're not relying upon a form contract term. They're embellishing it and changing it through extrinsic evidence that hasn't been reviewed by the class. Now, that's different from this Rodman case that the plaintiffs just put in recently that – in which the court – the district court found that a form contract did give rise to – did justify class-wide treatment. There, though, the term that was being interpreted, the term that was allegedly breached, was in the contract. It was a form contract, and the court simply said that it wasn't proper to introduce evidence to depart from that – that term. So let me turn to the court. So just one last point on that. Did the district court make a merits determination on that contract? Well, no. The district court didn't preclude the plaintiffs from making their own case on an individual basis. The court simply said with respect to extrinsic evidence that the extrinsic evidence would require an analysis of individual class member situations and what they – whether they saw the health center. But having incorporated into their complaint now the allegations that – these plaintiffs' allegations that they saw and relied upon the health center materials, nothing prevents them from going forward with that claim before the district court. So the court did not resolve the merits of that claim. The court had to, under Walmart, determine whether there was a class-wide contract. Likewise, under Halliburton, it was a threshold question that needed to be determined. And the court made findings on that issue as to whether there was a class-wide contract containing the term that plaintiffs argued. I don't – I want to – I want to turn as well, though, because when you get into these issues of what constitutes a legitimate clique, what constitutes a valid clique, that takes you immediately to the second set of problems that the district court identified and that really can't be surmounted, no matter how you come out on whether extrinsic evidence can be applied on a class-wide basis, for example, or whether custom and practice, which also has to be known to the parties. And here, by the way, it's not known because all the experts testify that nobody knows what anyone else is doing in terms of the clique filters. They're all kept secret and proprietary. So it's hard to import any known clique filter that should have been used here through industry custom. But even if you can overcome all those obstacles, you still have the problem of plaintiffs' experts, none of them, being able to identify what was a valid clique or an invalid clique, none of them having parameters for how long between cliques should be the appropriate time, you know, to disregard cliques. The impression staleness window, which was bandied about in the record as something that should be included, again, the experts did not have any opinion on what that should be, that is, the time between when the ad is surfed and the clique is made. And more importantly, more importantly, neither Mr. Jacobson nor plaintiffs' other experts even undertook to run the analysis. Did they have enough data? They had Facebook's data. Did they have the data that would have allowed them to construct the formula? Well, they had data. What they didn't have and they never formulated was what the appropriate parameters would be. In other words, what are the parameters that are going to be plugged into the data? The only thing Mr. Jacobson identified, Dr. Jacobson, was as an example of what he might do when he said he could develop an algorithm, he said, well, for example, there might be a time interval, like, that we might come up with that would be an appropriate time to disregard cliques if they're too close together. And that I could do with Facebook's data. I could look at the clique when the first clique came in, when the second clique came in. I can do that with Facebook's data. The problem is the plaintiffs have not limited themselves to that parameter, nor have they even identified what the time window would be, so it's impossible to tell what the input would be for that analysis. I thought that Mr. Jacobson said that the doctor said he could determine for a clique what was fraudulent. He said that, but he wasn't able to bear that out in his deposition testimony. He wasn't able to come up with a definition of invalid clique or a definition of fraudulent clique or any way of distinguishing between the two. He made conclusory statements in his expert reports, but wasn't able to substantiate them with anything. He admitted that he wasn't able to define what an invalid clique is, and he wasn't asked to do so. If you look at Facebook's analysis, and this is the other point that the district court relied on, it's crucial, and that is the Strauss-Friedberg report took the four points that the IAB guidelines that plaintiffs rely on say are the critical points in the lifestyle cycle of a clique. Initiated and measured cliques is something that happens at the publisher, at the Facebook side. Received and resolved cliques are something that happens at the advertiser's side. That's where you can look at the advertiser's data and actually see what happens to a clique. Now, why is that, why does that matter? Why can't you just look to Facebook's data? The problem is plaintiffs still need to identify what was wrong with what Facebook was doing. What are the new rules they would like to impose? They say what Facebook did was not legitimate. You have to look to the advertiser data to determine whether the clique resolved into actual traffic on the site, actual sign-ups. So we asked the court to look at that. Roberts. Judge Toshima has a question. Toshima. I have a sort of underlying question about this case that bothers me, maybe because I'm not too technologically oriented. But Facebook's case seems to come down to this. One, this subject is so technical and so complicated and we've purposely made our contract so ambiguous that no one's ever going to be able to file a class action on this. You know what it comes down to? Well, there is, Your Honor, Facebook doesn't publish the parameters that it uses to determine what's a valid and invalid clique. Facebook says we will use our tracking mechanisms. The practice of not making the parameters public is uniformly followed in the industry and is, in fact, acknowledged by the industry's publications that plaintiffs cite from the IAB. So there's no, and the deposition testimony that's in the record as well explains why that's the case. If you publish your parameters, then you're constantly going to be, you're going to have people who are out there trying to get around your filters. If you disclose what your filters are, the first thing that's going to happen is someone's going to do a workaround for your filter. And also the filters are constantly changing. So Facebook does say on its help center it's constantly updating and working on its systems in order to capturing not only traffic that reflects non-human sources, et cetera, but also it makes decisions that are just meant to provide additional value to advertisers. For example, a rule that says we won't charge for more than seven cliques in a 24-hour period, things like that. But I think that the, it is a conundrum of the need to keep it secret in order to avoid problems. But I don't think that, I mean, what comes across clearly in the record is people acting in good faith, attempting to serve the customers and to ensure that cliques that are billed are of value to the customer. And that's what the analysis of Straus-Friedberg shows and the district court relied on, is that what, when you actually look at that data, that's what you're seeing, is cliques translating into usable, useful traffic on the advertiser's site. I don't think we have any more questions. Thank you. Your Honor, Jonathan Chubb. Your Honor, everything we heard from my esteemed colleague was uniform. She talked about the filters and how they work. You didn't hear one time that anything is different for any advertiser. This case is about a difference in an opinion about their good faith, their bad faith, whether their filters are right, whether they're wrong. That's why this case should go forward as a class action, because it's one for all and all for one. They may be right. We don't think they are. We think we're going to prove at trial or defeat summary judgment why they breached the contract. But there is nothing in what counsel just said was individual. She didn't say Coca-Cola has a different filter. If that were the case, Your Honor, we wouldn't be here. If every advertiser had a different criteria for how they were billed, it would be impossible to do this case. But that's not the case. Let me ask a question. And we sort of reasoning backwards, reverse engineering, if it's a common filter, right. To detect these valid, invalid clicks and so forth. Are you saying necessary fault that has to be a uniform contract? I'm sorry, Ron. I didn't. I say if it's the same algorithm that used to filter, you know, all the clicks for everybody, reasoning backwards from that, does it necessarily follow then that all the contracts must be uniform? No, Your Honor. They don't have to be uniform. In other words, Coca-Cola might have a different pay scale or a different time for payment than Pepsi or Joe's Hardware. But what matters here and what we cited in the many, many cases in our brief is it only matters what is material. If that's not, if that's different, and see if the click filters were different for every advertiser, that's the material term. That would be a major problem trying to manage this as a class action, because you'd have too many different, you'd have a trial on every different advertiser. But here, when you have one filter, one criteria, again, I go back to my analogy. If there were 5,000 trials, Facebook would not be asserting a different defense to each advertiser. They would say, we, we, either they would say, and we don't really know because they never told us, either we don't have any, I'm sorry, either we have ultimate discretion and we used it, or we were reasonable in how we filtered the clicks out. But either one is the same argument for each advertiser. And that's what makes this case exactly a paradigm for a class action. I do want to, I do want to go back to the extrinsic evidence point. Facebook has, is proposing to this Court a per se, a bar to extrinsic evidence in a class action. We know that's not true. We know in the city search case, which was another click filter case in the Central District of California, in the, in the food service case out of the Second Circuit that we found in our 28J, there are legions of cases that say when the extrinsic evidence is common, it is appropriate for class-wide determination. This notion about that you had to have seen the extrinsic evidence, how could one see a trade usage? You don't look at trade usage. There's nothing you read about that. We don't need, for example, the FAQs to prove our case. The FAQs only demonstrate one thing, that Facebook was aware that there were some limits. Even if we were able to get those extrinsic evidence in, that wouldn't prove, that wouldn't prove they breached the contract because they could say, yeah, we knew we had legitimate obligation. We knew we could only charge for legitimate clicks, but you know what? That's what we did here. We only charged legitimate clicks. So the, the FAQs are not dispositive at all in this case. What's dispositive in this case is what is the standard? And common trade usage is, is just a black letter, plain, vanilla way to interpret a contract under California law. There's, there's nothing here that makes this case unique in any way to any advertiser. And to affirm this district court would be, you know, in essence, to affirm the merits ruling and to say that, that Comcast, Dukes, and Amgen go much further than where they go, and that, yes, district court, you should rule on the breach of the contract at this stage. And if you do that, that's acceptable under Rule 23. We submit it's not. Okay. Thank you. Roberts. Thank you very much. I appreciate it. We appreciate your arguments, both very helpful. And in case matter is submitted at this time.
judges: Quist, Tashima, Paez